Filed 3/30/22  P. v. Allen CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078439, D078884 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF002650) |
| NOEL ALLEN, | |
| Defendant and Appellant. | |

CONSOLIDATED APPEAL from a judgment and postjudgment order of the Superior Court of Imperial County, William D. Quan, Judge.  Affirmed in part; reversed in part; remanded with directions.

Charles M. Sevilla for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn, and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

Noel Allen was charged with committing a forcible lewd act upon a child under 14 years of age (Pen. Code,[1] § 288, subd. (b)(1); count 1) and a lewd act upon a child under 14 years of age (§ 288, subd. (a); count 2). Allen pled no contest to count 2. In exchange for the plea, the superior court dismissed count 1 and sentenced Allen to prison for eight years but suspended imposition of that sentence. The court then placed Allen on probation for five years subject to certain terms and conditions. In addition, the court imposed fines and fees. Allen timely filed a notice of appeal (case No. D078439).

On May 4, 2021, the court ordered Allen to pay restitution damages to the victim and the victim's mother. Allen timely filed a notice of appeal of the order awarding restitution damages (case No. D078884).

On its own motion, this court consolidated case Nos. D078439 and D078884.

In this consolidated appeal, among other things, Allen challenges certain probation conditions. Although he forfeited most of his arguments here by failing to object below (see *People v. Welch* (1993) 5 Cal.4th 228, 234-235 (*Welch*)), we still will consider any constitutional facial challenges Allen raises to the various conditions. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 885 (*Sheena K.*).) To this end, we agree with Allen that conditions prohibiting him from possessing sexually explicit material, frequenting certain areas, imposing a Halloween curfew, and requiring him to report any contact with law enforcement are unconstitutionally overbroad and/or vague. Thus, as we discuss *post*, these conditions must be stricken.

---

1       Statutory references are to the Penal Code unless otherwise stated.

2

However, we conclude that Allen's contention that both the economic and noneconomic restitution awards are not supported by substantial evidence lacks merit.

Finally, as Allen points out and the People concede, certain fees that have been imposed upon him can no longer be collected because of a change in the law. Thus, we will order those fees vacated.

Because we are striking some of the probation conditions and vacating some of the fees, we remand this matter to the superior court for further proceedings consistent with this opinion.

FACTUAL BACKGROUND[2]

During a forensic interview conducted on August 7, 2019, John Doe told investigators that he had been molested by Allen. Allen had called Doe's father and asked to take Doe out on a hunting trip. During the trip, Doe told Allen that he was worried about his mother's surgery. At that moment, Allen started kissing "all over" Doe's body. He then placed his hands down Doe's pants and groped his anus and genitals. Allen told Doe that he loved him, and he made Doe lay on his stomach while he fondled Doe's buttocks. Allen had offered Doe a beer earlier in the day.

After the assault, Doe asked Allen to take him home, but Allen tried to convince Doe to stay. Doe felt uncomfortable during the interaction, and Allen became upset with him. Allen eventually took Doe back to Doe's home. When Doe's father confronted Allen about the allegations, Allen denied molesting Doe and stated, "Well, I guess that ends that relationship." Allen then tried to intimidate the father by stating that "the paperwork and trials will be too much" and "you don't wanna go through that."

---

[2] Because Allen pled no contest, we take the background facts from the probation report.

3

## DISCUSSION

### I

### THE CHALLENGED PROBATION CONDITIONS

#### A.  Background

At Allen's sentencing hearing, the superior court indicated that it read and considered the probation officer's sentencing report.  Allen's counsel objected to drug and alcohol conditions contained in that report, noting that they required a "total abstention from the use and possession of alcoholic beverages" and that they were not relevant to this case.  In addition, defense counsel objected to another condition prohibiting Allen "from use or possession of any equipment, including cellular phones, which have the capacity for taking or viewing photographs, whether in still or video form."  Counsel again argued that the probation condition was not "sufficiently related to this case" and asked for it to be stricken.

Then, after conferring with Allen, Allen's counsel made a "special request" that Allen not be prohibited from going to Phil Swing Park because he had "been going there many, many years and ha[d] planted trees and done a number of things that give him a special interest in the park."  Counsel did not object to any other conditions proposed in the probation report.

The prosecution did not respond to any of the objections raised by Allen's counsel.  The court later stated that it would "follow the recommendations and the agreement that was reached."  The court did not impose the drug, alcohol, or the photograph/video viewing conditions.  However, the court did impose a variety of other conditions, many of which are typical in cases involving a violation of section 288.  Allen did not object to any of the imposed conditions, and we will discuss *post* those that he challenges in this appeal.

4

## B. Applicable Law

Challenges to probation conditions ordinarily must be raised in the trial court; if they are not, appellate review of those conditions will be deemed forfeited. (*Welch*, *supra*, 5 Cal.4th at pp. 234-235 [extending the forfeiture rule to a claim that probation conditions are unreasonable when the probationer fails to object on that ground in the trial court].) However, a defendant who did not object to a probation condition at sentencing may raise a challenge to that condition on appeal if the defendant's appellate claim "amount[s] to a 'facial challenge,' " i.e., a challenge that the "phrasing or language . . . is unconstitutionally vague and overbroad," and the determination whether the condition is constitutionally defective "does not require scrutiny of individual facts and circumstances but instead requires the review of abstract and generalized legal concepts—a task that is well suited to the role of an appellate court." (*Sheena K.*, *supra*, 40 Cal.4th at p. 885.)

Because Allen did not object in the superior court to any of the probation conditions he now challenges on appeal, he has forfeited any as-applied constitutional objections on appeal to the remaining conditions. We therefore address Allen's constitutional challenges to the subject conditions only to the extent that they " 'present "pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court." ' " (*Sheena K.*, *supra*, 40 Cal.4th at p. 889.)

### 1. Probation Conditions Affecting Allen's use of Computers and the Internet

The court imposed conditions relating to Allen's use of computers and the internet. To this end, Allen was subject to two conditions. The first limited his use of computers as follows (Computer Use Condition):

> "[Allen] will not use or possess a desktop, laptop, or any
> other type of computer or other device capable of accessing

5

the Internet or storage media for personal use, except at [Allen]'s place of employment, volunteer service, or school of current enrollment. Possession of any of these items must have prior written approval by the probation officer."

The second involved limitations of his use of the internet (Internet Use Condition):

"[Allen] will not subscribe or have access to any form of online Internet service, including social networking sites, without the written permission of his probation officer. Any approved subscription or access will be subject to all restrictions as determined necessary by his probation officer."

Allen's primary argument challenging the Computer Use and Internet Use Conditions is that "there is nothing at all in this case having to do with the internet or laptop computers." To this end, Allen asks us to consider the circumstances of his offense and the fact that he did not use his computer or the internet to commit his crime. This is not a facial challenge that requires us to only review the challenged probation conditions themselves, but instead, Allen raises an as-applied challenge to both these conditions. Yet, because Allen did not object to either the Computer Use Condition or Internet Use Condition below, he has forfeited his as-applied challenge here. (*Welch*, *supra*, 5 Cal.4th at pp. 234-235.)

Nevertheless, Allen points out that his attorney objected to a different probation condition prohibiting Allen from using or possessing any equipment, including cell phones, which have the capacity for taking or viewing photographs or videos. In making this objection below, Allen's attorney noted there was no evidence that Allen inappropriately used any media in this matter. The court ultimately did not impose that condition. Allen claims his objection "alert[ed] the court that conditions involving use of

6

electronic media were completely unrelated to the case.  That was enough to preserve the points raised for review here."  We disagree.

We observe that Allen provides no authority supporting his argument that an objection to one probation condition puts the court on notice that he is challenging other conditions as well.  Indeed, case law supports the People's contention that a specific objection must be made to preserve the issue for appeal.  (See *People v. Seijas* (2005) 36 Cal.4th 291, 302 [failure to make a specific and timely objection on the ground asserted on appeal makes that ground not cognizable]; *People v. Kendrick* (2014) 226 Cal.App.4th 769, 777-778 [failure to object to the condition forfeits any as applied constitutional challenge].)  Here, Allen's attorney objected to a condition involving cell phones as well as a condition involving alcohol.  However, when the court imposed the Computer Use and the Internet Use Conditions, he remained silent.  As such, his as-applied challenge was not preserved for appeal.[3]

Although Allen forfeited his as-applied challenge to the Computer Use and Internet Use Conditions, he nonetheless maintains that the condition stating that Allen "will not subscribe or have access to any form of online Internet service, including social networking sites, without the written permission of his probation officer" is unconstitutionally overbroad and violates the First Amendment.  Yet, other than making this assertion, Allen does little to explain how this condition is facially unconstitutional.  Rather, he incorporates his arguments that the condition is not related to his offense and asks us to consider that he is an 88 year old, retired man and does not attend school.  Again, such arguments are not consistent with a facial

---

[3]     Allen points out that appellate courts may address a forfeited issue to foreclose a later ineffective assistance of counsel claim.  However, Allen has not argued his attorney was constitutionally ineffective, and we decline to address a forfeited claim on the record before us.

7

challenge as they require us to consider more than merely the condition itself. (See *People v. Patton* (2019) 41 Cal.App.5th 934, 946 (*Patton*) [noting a facial constitutional challenge presents pure questions of law that can be resolved without referring to the particular sentencing record developed below].)

Nonetheless, we will consider Allen's assertion that the Internet Use Condition is unconstitutionally overbroad on its face. "A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) " ' "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." ' " (*Patton*, *supra*, 41 Cal.App.5th at p. 946.)

In considering the challenged condition, we do not find it constitutionally overbroad on its face. In *People v. Pirali* (2013) 217 Cal.App.4th 1341 (*Pirali*), the appellate court rejected an overbreadth challenge to a probation condition restricting internet access. The subject probation condition provided: " 'You are not to *have access* to the Internet or any other on-line service through use of your computer or other electronic device at any location without prior approval of the probation officer.' " (*Id.* at p. 1345.) The court concluded that the probation condition at issue was not a "blanket prohibition" on internet access because it "grants defendant the ability to access the Internet on his computer and other electronic devices so long as he obtains prior permission from his [probation] officer." (*Id.* at pp. 1349-1350; see *United States v. Rearden* (9th Cir. 2003) 349 F.3d 608, 621

8

["The condition does not plainly involve a greater deprivation of liberty than is reasonably necessary for the purpose because it is not absolute; rather, it allows for approval of appropriate online access by the Probation Office"].)

In the instant case, as in *Pirali*, the probation condition limiting Allen's internet access permits Allen to access the internet after having obtained permission from the probation officer. Thus, the Internet Use Condition imposed here is not a "blanket prohibition" on internet access (*Pirali*, *supra*, 217 Cal.App.4th at p. 1349), and it is not unconstitutionally overbroad.

Allen also contends the clause subjecting his internet access to his probation officer's approval renders the condition "totally vague as to what the standards the officer is to use in granting permission." Alternatively stated, Allen claims the probation condition allows his probation officer to act in an arbitrary and capricious manner in exercising his or her discretion to prohibit Allen from accessing the internet. However, this is mere conjecture. There is nothing in the record that leads us to believe the probation officer will act unreasonably in approving Allen's use of the internet for legitimate purposes. Further, we must presume that a probation officer will reasonably exercise the discretion afforded him or her by a probation condition and will not arbitrarily restrict a probationer's freedoms in a manner not tailored to rehabilitative or safety purposes. (See *People v. Olguin* (2008) 45 Cal.4th 375, 383 [noting the challenge probation term did not " 'authorize a probation officer to irrationally or capriciously exclude a pet' "]; *In re Hudson* (2006) 143 Cal.App.4th 1, 11 ["we will not assume that [probation officer] will unreasonably withhold permission for legitimate computer and Internet usage"].) In addition, we are not persuaded by Allen's argument that the Internet Use Condition "eliminates his ability to own a laptop or [iPad] or use

9

a smart phone (which is a computer) in order to use email to communicate with anyone." He simply must ask his probation officer for approval.

## 2. Search Prohibition Conditions

The court also imposed conditions relating to Allen's Fourth Amendment rights as follows:

> "[Allen] will also need to submit his person and property, including vehicles and place of abode, to warrantless search and seizure at any time of the day or night, with or without probable cause, by the probation officer or by any law enforcement officer. [¶] . . . [¶]

> " . . . [T]he Fourth Amendment waiver conditions will include . . . any electronic devices, meaning any device that stores, generates, or transmits information in electronic form.

> "[Allen] will need to supply any password or pass phrase to unlock or remove encryption from any file, system, computer, or any type of electronic device he may have access to.

> "The Fourth [Amendment] waiver will also include any location where this data may be stored, including networks and off-site servers."

Allen challenges certain portions of these search conditions.[4] Specifically, he argues that he should not be subject to an electronic search condition[5] because it is overbroad, violates his privacy rights, and was not related to his offense. To the extent Allen has not forfeited these challenges, we disagree.

Again, Allen appears to be making an as-applied challenge to a probation condition that he did not object to below. For example, he supports his argument by citing *In re Ricardo P.* (2019) 7 Cal.5th 1113 and other cases concerning the application of the reasonableness analysis in *People v. Lent*

---

[4] The People argue that Allen's challenge to the Fourth Amendment Condition that he submit his person and property to a warrantless search at any time is without merit. However, except for listing this condition and claiming he would challenge it, Allen advances no argument as to why it is constitutionally infirm. It is an appellant's burden to affirmatively demonstrate error. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.) Thus, an appellant bears the burden to support any claim of error with reasoned argument, analysis, and citation to pertinent legal authorities, and the failure to do so forfeits this issue on appeal. (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93; *People v. Sorden* (2021) 65 Cal.App.5th 582, 603.) As such, to the extent Allen is challenging the condition allowing the warrantless search of his person and property, we find such argument forfeited.

[5] As part of his probation, the court imposed and Allen agreed that his Fourth Amendment waiver extended to any electronic devices and that he would have to supply any password or pass phrase to unlock or remove encryption from any file, system, computer, or any type of electronic device he may have access to.

(1975) 15 Cal.3d 481 (*Lent*).[6] However, none of the cases on which Allen relies address a facial constitutional challenge to an electronics search condition. (See, e.g., *Ricardo P.*, at pp. 1119-1120 [invalidating the electronics search condition because it violated the third prong of *Lent*].) Consequently, to the extent Allen raises an as-applied claim or a challenge based on reasonableness under *Lent*, these arguments are forfeited due to his failure to object below. (*Welch, supra*, 5 Cal.4th at pp. 233-235; *Sheena K., supra*, 40 Cal.4th at pp. 880-881, 889.)

Yet, even if we considered a facial challenge to the electronics search condition that it was unconstitutionally overbroad, we would reject such a claim. As we discussed *ante*, the essential question in a facial overbreadth challenge is whether the probation condition, in the abstract, and not as applied to a particular probationer, is narrowly tailored to a compelling state interest. (*Sheena K., supra*, 40 Cal.4th at p. 885.) In light of a probationer's diminished expectation of privacy and the probationer's offense, there are cases where an electronics search condition is sufficiently tailored to the state's legitimate interest in effectively supervising the probationer and promoting his rehabilitation and public safety. (See *Patton, supra*, 41 Cal.App.5th at pp. 946-947 [rejecting a facial constitutional challenge to an electronics search condition because it is not invalid in all its applications]; *People v. Ebertowski* (2014) 228 Cal.App.4th 1170, 1175-1176 [rejecting overbreadth challenge to a probation condition requiring defendant to provide passwords to his electronic devices and social media websites].) Because

---

6    A condition of probation or supervision will not be held invalid as unreasonable unless it " '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.' " (*Lent*, at p. 486.)

12

Allen cannot establish that the electronics search condition imposed here does not "have any valid application," his constitutional overbreadth challenge is without merit.  (*Patton*, *supra*, 41 Cal.App.5th at p. 946.)

### 3.  Probation Conditions Involving Sexually Explicit Material

The court also imposed conditions regarding Allen's possession of sexually explicit materials and frequenting establishments that contain such materials as follows:

> "[Allen] will not own, use, or possess any form of sexually explicit movies, videos, material, or devices unless recommended by the therapist and approved in writing by his probation officer.

> "[Allen] will not frequent any establishment where he knows or reasonably should know [sexually explicit movies, videos, material, or devices] are viewed or sold, and cannot utilize a telephone service he knows or should know to be sexually oriented."

Allen challenges the first condition, prohibiting his possession of sexually explicit material, on the ground it is unconstitutionally overbroad. He notes that this condition would prohibit him from owning or watching any movie that includes "nude or semi-nude scenes suggestive of sexual conduct, a staple of many movies."  In this sense, it appears Allen interprets the term "sexually explicit" to apply to any movie in which suggestive nudity appears. For their part, the People seem to agree with such an expansive view of what is forbidden, arguing "[t]o the extent [Allen] also complains that mainstream movies, famous paintings and statutes may fall within the prohibited category of sexually explicit materials . . . such limitations were part of the bargain he struck in accepting probation over incarceration."  Yet, simply pointing out that a defendant agreed to a probation condition does not cure the condition's constitutional ills.  In other words, the People do not defend

13

the constitutionality of this probation condition.  Rather, they simply assert little more than Allen is stuck with it because he did not object to it.  Such an argument does not carry the day.

In the instant action, Allen emphasizes that a similar probation condition was found unconstitutionally overbroad in *In re Carlos C.* (2018) 19 Cal.App.5th 997 (*Carlos C.*).  There, the court held that a condition prohibiting possession of material depicting partial or complete nudity similar to the condition at issue in the present case was overbroad.  (*Id.* at p. 1002.)  The court observed that several federal circuit decisions had "struck down as unconstitutionally overbroad conditions prohibiting adult offenders from possessing depictions of nudity.  [Citations.]  The overbreadth of this type of condition is both sweeping and obvious:  'By its terms, it would prohibit [defendant] from viewing a biology textbook or purchasing an art book that contained pictures of the Venus de Milo, Michelangelo's David, or Botticelli's Birth of Venus, all of which depict nudity.' "  (*Ibid.*)  The court struck the prohibition, reasoning that "[r]estricting a minor's access to such a wide range of materials with potential artistic, cultural and/or educational value imposes a significant burden on the minor's constitutional rights with little, if any, discernible impact on the minor's reformation and rehabilitation, even a minor adjudged to have committed a sex offense." (*Id.* at p. 1004.)

The same can be said of the prohibition on material that is "sexually explicit."  The phrase would encompass, for example, many lauded works of literature, art, and movies. (See *United States v. Simons* (8th Cir. 2010) 614 F.3d 475, 483.)  Moreover, as we discussed *ante*, the People do not attempt to justify the subject probation condition as constitutional.  They do not address

14

the holding of *Carlos C.*, *supra*, 19 Cal.App.5th 997. They simply claim the condition should remain because Allen agreed to it.

We agree with *Carlos C.* that the prohibition on possessing material depicting nudity is unconstitutionally overbroad, as we conclude is the prohibition on possessing sexually explicit material, and we agree that the overbreadth is most appropriately rectified by striking the unconstitutional condition.[7]

Allen also notes that the condition prohibiting him from "frequent[ing] any establishment where he knows or reasonably should know such items [sexually explicit movies, videos, material, or devices] are viewed or sold and cannot utilize a telephone service he knows or should know to be sexually oriented" is also overbroad because the phrase "such items" encompasses "sexually explicit" material like the previous condition. For the reasons we discussed *ante*, we agree that this condition, too, is unconstitutionally overbroad.

In addition, Allen argues use of the word "frequent" renders the probation condition unconstitutionally vague. "A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*Sheena K.*, *supra*,

---

[7] As part of his challenge against the prohibition against possessing sexually explicit materials, Allen attempts to include, with a single sentence, a challenge to the following condition: "[Allen] will not own, use or possess any child erotica, pedophilic paraphernalia or any illustrated materials that he should reasonably know depicts or purports to depict unclothed persons under the age of 18." He, however, does not explain how this condition is unconstitutionally overbroad. Further, we see no constitutional infirmity in this condition and do not strike it.

15

40 Cal.4th at p. 890.) A restriction failing the test does not give adequate notice—"fair warning"—of the conduct proscribed. (*Ibid*.)

Here, Allen relies on *In re H.C.* (2009) 175 Cal.App.4th 1067 (*H.C.*), arguing the term "frequent" is obscure and susceptible to multiple meanings. (See *id.* at p. 1072 [noting the obscurity of the term "frequent" and the difficulty of proving the minor violated a condition ordering him " 'not [to] frequent any areas of gang related activity' "].) The People counter that the term "frequent" as used in the challenged condition is a verb and "a reasonable person would understand the term to mean 'to associate with, be in, or resort to often or habitually.' " Consequently, the People maintain that the term "frequent" is used in this probation condition to prohibit Allen from habitually visiting places where sexually explicit materials are viewed or sold.

However, substituting the phrase "habitually visiting" for the term "frequent" does not make the challenged condition less vague. As the court in *H.C.* noted, "How the District Attorney would prove that someone 'habitually' visited an area of gang activity, challenges the imagination." (*H.C., supra,* 175 Cal.App.4th at p. 1072.) We have similar misgivings about use of "frequent" in the challenged condition here. Even if we agree with the People that frequenting a place is the same as habitually visiting it, we are not clear as to what habitually visiting would entail. Would it be once a week? Twice a week? Once a month? Although we acknowledge that a vagueness inquiry requires only "reasonable specificity," not "mathematical certainty" (*Sheena K., supra,* 40 Cal.4th at p. 890), here we conclude that the phrase "frequent" does not provide the type of reasonable specificity necessary to inform Allen what is required of him (see *ibid*). As such, this condition must be struck as well.

16

### 4. Condition Prohibiting Allen from Congregating with Minors

Allen also is prohibited from interacting with minors as follows:

> "[Allen] will not associate or communicate with anyone he knows or reasonably should know to be under the age of 18 or frequent places where he knows or reasonably should know that persons under the age of 18 congregate, including, but not limited to, schoolyards, parks, amusement parks, concerts, playgrounds, swimming pools, and arcades."

Allen maintains this condition is unconstitutionally vague because "[i]t is foreseeable that young people might congregate at many common locations not especially designated for use by minors," and that he "would be in violation of this probation condition if he unwittingly visits such a locale." However, Allen's concerns are adequately addressed because the condition contains a knowledge requirement that protects Allen against any inadvertent violations of probation. (*People v. Hall* (2017) 2 Cal.5th 494, 498; *People v. Patel* (2011) 196 Cal.App.4th 956, 960 [noting the well-settled rule that a probationer cannot be punished for presence, possession, or association without proof of knowledge].) Moreover, the condition contains a constructive knowledge requirement ("reasonably should know") that also protects Allen in situations where he had no reason to know minors would congregate at a certain place. Because a probationer may reasonably not know whether he is visiting a place where minors typically congregate, a constructive knowledge requirement provides additional fair notice and helps avoids vagueness problems. (See *People v. Turner* (2007) 155 Cal.App.4th 1432, 1436 (*Turner*).)

Yet, Allen contends that the constructive knowledge requirement should be stricken from the condition because it is inconsistent with the holding in *Sheena K.*, *supra,* 40 Cal.4th 875 and the "constitutional requirements of actual notice to the probationer." However, our high court in

*Sheena K.* "did not discuss whether the required knowledge must be actual or could be constructive." (*People v. Mendez* (2013) 221 Cal.App.4th 1167, 1174 (*Mendez*) [declining to "interpret the court's implicit approval of adding actual knowledge as precluding probation conditions which reference constructive knowledge"].) *Sheena K.* only addressed and affirmatively answered two questions: whether a knowledge requirement to a probation condition was necessary and whether that knowledge element should be explicit. (*Ibid.*) Consequently, the post-*Sheena K.* cases that added a constructive knowledge element to avoid a vagueness challenge are not inconsistent with that opinion. (See *Turner*, *supra*, 155 Cal.App.4th at p. 1436 [modifying a probation condition "to require that defendant must either know or reasonably should know that persons are under 18 before he is prohibited from associating with them"]; *People v. Moses* (2011) 199 Cal.App.4th 374, 377, 381-382 [modifying probation terms to add both actual and constructive knowledge requirements such that defendant is prohibited from "associat[ing] with any persons you know or reasonably should know to be minors, or frequent[ing] places where you know or reasonably should know minors congregate"].)

Moreover, the constructive knowledge requirement is not unconstitutionally vague because it is "sufficiently precise for the probationer to know what is required of him or her, and for the court to determine whether the condition has been violated." (*Mendez*, *supra*, 221 Cal.App.4th at p. 1177.) Indeed, "[i]t may in fact be easier [for a trial court] to establish what a probationer reasonably should know than to delve into the epistemological depths of what the probationer actually knows." (*Id.* at p. 1178.) Additionally, "[h]olding a probationer to the standard of a reasonable person should promote his or her rehabilitation, not subvert it. A

18

probationer should be encouraged to be aware of the status of acquaintances and to actively avoid potentially dangerous companions.  Willful ignorance of warning signs should not be rewarded by the conclusion that a probation condition was not violated because the probationer did not actually, subjectively recognize [a prohibited condition]." (*Id.* at p. 1177; cf. *People v. Mathews* (1994) 25 Cal.App.4th 89, 98 ["Culpability based on the . . . constructive knowledge standard is not vague or overbroad"].)  Thus, the constructive knowledge language does not render the condition unconstitutional.

We also are not persuaded by Allen's overbreadth challenge to this probation condition.  Probationers do not enjoy the absolute liberty to which other citizens are entitled.  (*Griffin v. Wisconsin* (1987) 483 U.S. 868, 874; see *People v. Mills* (1978) 81 Cal.App.3d 171, 181 [any person who commits sexual offense has waived any right to privacy].)  Moreover, the state has a compelling interest in ensuring the safety of children, and this compelling interest justifies restrictions on a probationer's constitutional rights.  (*People v. Delvalle* (1994) 26 Cal.App.4th 869, 879 [rejecting overbreadth and vagueness challenge to a probation condition requiring defendant from staying away from places where minor children congregate]; *People v. Robinson* (1988) 199 Cal.App.3d 816, 818 [the "restriction of the right of association is part of the nature of the criminal process"].)

Although we neither find the prohibition against congregating with minors unconstitutionally vague because of its inclusion of constructive knowledge nor overbroad, we are troubled by the condition stating that Allen cannot "frequent" certain places.  As we discussed *ante*, "frequent" does not sufficiently provide Allen with notice about what is prohibited.  (See *H.C.*, *supra*, 175 Cal.App.4th at p. 1072.)  Again, we do not know how many times

19

visiting the subject locations would constitute frequent.[8]  Consequently, the subject condition is unconstitutionally vague and must be struck.

### 5.  The Halloween Condition

The court imposed a condition enacting certain restrictions on Allen during the evening of Halloween until the following morning.  That condition provides:

> "[Allen] will also comply with all Halloween probation conditions, which include a 5:00 p.m. to 5:00 a.m. curfew in which [he] shall remain inside his residence on Halloween.
>
> "[Allen] on Halloween will have no exterior lights of the residence turned on, or as to appear as if anyone is home. Such would discourage children from approaching.
>
> "[Allen] will not offer any Halloween candy, and no Halloween decorations will be allowed.
>
> "During the curfew, [Allen] will only open the door for law enforcement or probation officers."

Allen challenges this condition, claiming it is vague and overbroad.  He points out that it is unclear what interior lights, if any, he can turn on during the curfew period on Halloween.  He questions whether the use of a flashlight

---

[8]      Allen proposes to substitute the word "visit" for "frequent" to cure the condition's vagueness problem.  However, the word "visit" and "frequent" are not interchangeable.  Frequent involves habitually visiting while visit consists of an act of going or coming to see a person or place.  In other words, frequent would involve multiple trips to the forbidden area (implying that a single trip would not be prohibited) where a single instance of going to the forbidden area would constitute a visit.  Moreover, in the respondents' brief, the People do not agree with such a change.  That said, at oral argument, the People implied they might be amenable to substituting the word "visit" for "frequent."  Nonetheless, because we are remanding this matter to the superior court, we leave it to the parties to address this issue below.

20

in his own home (necessitated because he might be prohibited from turning on interior lights) would be a probation violation under this condition as written.

In addition, he claims the restriction that he cannot open the door for anyone except for law enforcement during the curfew period is overbroad and should be narrowed to only prohibit him from opening the door to greet trick or treaters.

The People argue this condition is not unconstitutionally vague because (1) it explicitly prohibits Allen from turning on the exterior lights of his home and (2) can be reasonably construed as prohibiting Allen from turning on any interior lights that can make it appear, from the outside of the home, that someone is inside. The People point out that Allen is in the best position to know which lights inside his home, if turned on, are capable of reflecting light to the outside and are reasonably likely to encourage children to approach.

The People also argue that the condition is already narrowly tailored in that it is limited to a 12-hour period beginning on the evening of Halloween and ending early the following morning. Moreover, the People emphasize that if Allen were permitted to open his door for any innocuous reason, like taking out the trash, during a time in which children are trick or treating, it would signal to the children that Allen was home and encourage them to knock on his door in pursuit of candy. Therefore, according to the People, narrowing the door opening restriction further would undermine the situation the condition is meant to avoid—children trick or treating at Allen's home.

We agree with the People that the portion of this Halloween condition prohibiting Allen from opening the door only for law enforcement during the

curfew period is not overbroad.  The condition already prohibits Allen from leaving his home from 5:00 p.m. to 5:00 a.m. beginning on Halloween, and Allen does not challenge that provision here.  Thus, the requirement that he only open his door during that period is narrowly tailored to achieve the objective that Allen do nothing to attract trick or treaters to his home on Halloween.

Nonetheless, the prohibition that *may* prohibit Allen from turning on certain interior lights at his home during the curfew gives us pause.  Again, that prohibition states that Allen "will have no exterior lights of the residence turned on, or as to appear as if anyone is home."  It is the second clause of the sentence that is concerning.  Allen insists that clause is vague because it might prohibit him from having any lights on inside his house or even prevent from using a flashlight for fear that someone walking by might see the light and then, believing someone was home, trick or treat at Allen's home.  The People argue that a probation is not unconstitutionally vague simply because there may be some " ' " 'difficulty in determining whether some marginal or hypothetical act is covered by its language.' " ' "  (*In re I.V.* (2017) 11 Cal.App.5th 249, 261 (*I.V.*).)  To this end, the People acknowledge the condition could apply to interior lights and note that Allen is in the best position of knowing which lights inside his home are capable of reflecting light to the outside and reasonably likely to encourage children to approach.  Alternatively stated, the People contend the clause "as to appear as if anyone is home" is not unconstitutionally vague because it informs Allen that he may not have any interior lights on in his house during the Halloween curfew that make it appear as if someone is home.

This condition does not clearly forbid Allen from turning on any interior light in his home.  Nevertheless, Allen worries that it might and is concerned

that any interior light he might turn on during the curfew period could be a violation of this probation condition. In this sense, he contends he does not know what is forbidden by the condition.

The People's response does not make the condition any less vague. They maintain it is a reasonable interpretation that some interior lights may not be turned on during the curfew period, and Allen is in the best position to determine which lights would most likely give the impression that he is home. In other words, under the condition as interpreted by the People, Allen must determine which interior lights make it appear that he is home to hypothetical trick or treaters and then not turn on those lights during the curfew period.

Although we appreciate the goal of this condition is to prevent Allen coming into contact with children who are trick or treating, we nonetheless find the portion of the condition "or as to appear as if anyone is home" needlessly vague. Indeed, both Allen's and the People's respective arguments only underscore our conclusion. As written, the condition leaves Allen to ascertain what interior light, if turned on, might attract a trick or treater to his home. The People argue that we need not be concerned with "some marginal or hypothetical act" that might be covered by this condition (see *I.V.*, *supra*, 11 Cal.App.5th at p. 261), but the scenario we posit is neither marginal nor hypothetical. Per the condition, Allen must remain at his house beginning at 5:00 p.m. Halloween evening until 5:00 a.m. the next day. He cannot open his door for anyone, except law enforcement. No exterior light may be turned on during this time. He may not display any Halloween decorations or offer any candy. Allen is confined to his home, and, as such, must be able to move about his own home while it is dark outside. Logically, he will need to turn on some interior lights. This condition requires him to

23

guess at what interior light might violate this probation condition if turned on during the curfew. This portion of the condition cannot stand.

The objective of this Halloween condition might be sufficiently achieved simply by requiring Allen to remain in his house during the curfew, only answer the door for law enforcement, refrain from displaying Halloween decorations or offering candy, and keep all exterior lights turned off. Or, perhaps, considering the layout of Allen's house, the superior court could find it necessary that a certain interior light (e.g., a living room light with a window to the street in front of the home) should not be turned on during the curfew period. If that is the case, then the condition could be rewritten to address that situation. However, as the condition reads now, it is unconstitutionally vague, and it must be stricken.

6. The Law Enforcement Contact Condition

Allen's final challenge to his probation condition concerns a condition whereby: "[Allen] will need to report any arrests and/or police contacts within 48 hours to his probation officer. To this end, Allen relies on *People v. Relkin* (2016) 6 Cal.App.5th 1188 (*Relkin*). There, the court considered a probation condition that required the defendant "to 'report to the probation officer, no later than the next working day, any arrests or any contacts with or incidents involving any peace officer.' " (*Id.* at p. 1196.) The court concluded that "the portion of the condition requiring that defendant report 'any contacts with . . . any peace officer' " was vague because it left him to guess what events or interactions would qualify as reportable. (*Id.* at p. 1197.) According to the court, it was not certain that the condition would not be triggered "when defendant says 'hello' to a police officer or attends an event at which police officers are present, but would be triggered if defendant were interviewed as a witness to a crime or if his 'lifestyle were such that he

24

is present when criminal activity occurs.' " (*Ibid*.) "The language does not delineate between such occurrences and thus casts an excessively broad net over what would otherwise be activity not worthy of reporting." (*Ibid*.)

Allen contends that the term "police contacts," as in *Relkin*, "leave[s] one to guess what sorts of events and interactions qualify as reportable," and "casts an excessively broad net over what would otherwise be activity not worthy of reporting." The People agree that the requirement Allen report and identify himself in "any police contacts" is vague. Moreover, they concede it is unclear to a reasonable reader whether Allen is required to identify himself only when he is asked to provide "identifying information," or during any "casual, random interactions with law enforcement officers." (See *People v. Brand* (2021) 59 Cal.App.5th 861, 870-871 [upholding police contact probation condition against vagueness and overbreadth challenges because it is objectively clear it refers only to those police contacts where the defendant "is questioned by law enforcement officers and is required to give identifying information, such as when he has been a witness to a crime or is suspected of possible involvement in a crime"].) Accordingly, this condition must be struck as well. However, as the People point out and the court approved in *Brand*, this condition would pass constitutional muster if rewritten as follows: Allen shall provide his true name, address, and date of birth if contacted by police. He shall report such a contact or arrest to the probation officer within 48 hours, including the date of contact/arrest, charges, if any, and the name of the law enforcement agency. During any such police contact, Allen shall identify himself to any peace officer and advise that officer during the police contact that he is on probation and subject to warrantless search. (See *id*. at p. 870.) The rewritten condition makes clear that Allen would only have to

report a contact with law enforcement if he was asked to provide his name and contact information.

### 7.  Revision of the Constitutionally Flawed Conditions

In summary, we conclude the probations conditions:  (1) relating to Allen's possession of sexually explicit material, (2) limiting his presence at establishments selling or containing sexually explicit material, (3) prohibiting him from congregating with minors, (4) imposing a curfew on Halloween, and (5) requiring him to report contacts with law enforcement must be stricken because they are facially unconstitutional.  Although we have proposed some potential language that could make some of the challenged probation conditions facially constitutional, and we possess the authority to modify an unconstitutional probation condition on appeal (see *Sheena K.*, *supra*, 40 Cal.4th at p. 892), here, we believe the more prudent approach would be to remand the matter to the superior court and allow it to fashion constitutional probation conditions consistent with this opinion and the needs of the public as well as Allen.  On remand, we encourage the superior court to consider the scope of the probation conditions and what purpose these conditions are intended to serve.  (See, e.g., *In re D.H.* (2016) 4 Cal.App.5th 722, 729.)

## II

## THE RESTITUTION AWARD

### A.  Allen's Contentions

Allen contends the trial court's restitution order must be reversed because the economic and noneconomic restitution awards were not supported by sufficient evidence.  Specifically, he argues that the evidence supporting the restitution claims is unreliable and fails to show causation.  We disagree.

## B. Background

On February 23, 2021, the probation department filed a memorandum regarding economic and noneconomic damages sustained by Doe and Doe's mother. According to Doe's mother, Doe was no longer the same "happy go lucky kid," and now suffers from panic attacks, anger issues, nightmares, and anxiety. She stated that Doe suffered from panic attacks after every court appearance, which required her to take the following day off from work to take care of him. As such, she no longer involved him in the court process. Doe was a "mild mannered boy before this incident" but "is now confrontational, he will fight," and he "hates everyone."

Doe's mother also reported that her son had attended counseling once per week but was advised by the counselor that he will need to attend twice a week. The probation department contacted a local licensed clinical social worker, who stated that "the sessions must be Trauma Focused Cognitive Behavioral Therapy." The social worker estimated that each session costs $120 and that Doe would receive two sessions per week until he turned 21 years old. The probation officer noted that the actual amount could vary because the estimate was based on numbers from a local counselor.

At the restitution hearing, the court heard testimony from Doe's mother regarding the psychological harm that Doe sustained. She testified that Doe suffered from nightmares once or twice per week ever since the incident. Before the incident, he "very rarely" had any nightmares. Doe also developed trust issues and fear toward male family members as a result of the incident, and he no longer felt safe at home unless his mother was present. Doe was no longer making friends. He became angry easily, and his behavior would get worse whenever she took him to court. He also developed

27

panic attacks that occurred three to four times a week. During the panic attacks, Doe experienced chest pain and problems breathing. Each panic attack lasted anywhere from a few minutes to about 15 or 20 minutes.

Doe's mother testified that she first placed Doe in counseling six months after the incident, in February 2020. He initially saw a school counselor twice a week but made little progress. Doe then saw a different counselor for several sessions before ultimately seeing a specialist for intense counseling once a week. According to Doe's mother, Doe seemed to be making progress with this specialist, and his panic attacks reduced to once or twice per week around November 2020. Doe's mother mentioned that she had brought Doe in for counseling several years before the incident involving Allen because there was a lot "going on with our family," and she wanted to address "some behavior issues [she] was concerned about." However, after about three sessions, the counselor indicated that Doe "was just a normal kid," so she discontinued counseling for Doe until he was molested by Allen. She emphasized that the current counseling sessions were "absolutely 100 percent related to the [criminal] action."

On March 18, 2021, the probation department filed a memorandum containing information related to expenses incurred by Doe's mother. Per the report, she requested the following: $1,609.74 in lost wages (due to missing 99 hours of work at a rate of $16.26 per hour); $91.50 in mileage expenses (due to attending two court hearings calculated at 163.4 miles x .56 per mile); $95,160 in tutoring expenses for Doe for the next five years; $4,092 in medical expenses for Doe; $171,600 in counseling expenses; and $25,168 in mileage expenses for the counseling sessions. The counseling expenses were calculated as follows: the psychologist recommended amount of two sessions

per week ($150 per session, for a total of $300 per week) until Doe turned 21 years old (11 years, or 572 weeks). The counseling mileage expenses were calculated as follows: $22 in mileage per session, for a total of $44 per week, for a total of 11 years (572 weeks). The memorandum included the contact information for both Doe's current and previous counselors. A spreadsheet for reimbursement also was attached to the memorandum.

Allen's counsel filed a memorandum opposing the restitution recommendation that included the grand total of $297,721.24. He objected that the figures were based on hearsay, unidentified sources, and "involve[d] speculative assessments without foundation." He continued, "No expert counseling reports have been produced or referenced to discern the minor's issues, or to provide a basis to find that he would benefit from, or will need more than, a decade of counseling at double the frequency of his current sessions." Defense counsel also objected on the grounds that there was "no way of knowing whether [Doe]'s treatment needs arise from a preexisting condition or are properly attributed to the incident herein." He also claimed that there was not substantial evidence of the expenses because "the source of the restitution figures comes from [Doe's mother], and the needed therapy projections are from an unknown source which [appellant] has no means to test." Further, he claimed, "If [Allen] was provided a written counseling report concerning the basis for the enormous amounts sought, there would presumably be some factual representation for the court to examine. Here, we have only unsupported hearsay statements by the parent."

The court informed Doe's mother that it needed additional information as to the counselor's experience, the average length of recovery, and length of counseling required: "[T]hese are the things that, you know, I think the court needs in order to give an amount of restitution in this, especially for the

29

economic side." Doe's mother told the court that the counselor "said it's going to be a lifetime event" and that the counselor "doesn't know" because "no two cases are the same."

Allen's counsel objected that it was "not proper foundation for this stuff to base any decision on the statements of the mother without support of corroborating information" and the court took note of the objection. The defense did not provide any evidence, and counsel submitted on the authority that was presented in the memorandum.

On April 20, 2021, the probation officer filed a supplemental report, which included a letter from Doe's counselor dated April 8, 2021, that read in part:

> "I have been [Doe's] counselor since 10/29/2020 and have provided a total of 10 counseling sessions. The purpose of therapy has been for [Doe] to learn healthy ways to manage his emotions and to provide him a place to potentially address past trauma. As of the most recent therapy session it was agreed to change frequency of treatment to once every 4 weeks due to progress and stability.
>
> "At this time it is not possible to determine length of future treatment. Frequency and length of treatment is typically re-evaluated every 6-12 months or sooner depending on need."

On June 7, 2021, the court prepared an amended restitution order summarizing its findings. The court indicated that it read and considered the probation officer's reports, the court file, the evidence presented at the hearings, arguments by both counsel, and the testimony of Doe's mother. The court imposed $109,800 in noneconomic restitution damages to Doe under section 1202.4, subdivision (f)(3)(F), and $20,301.24 in economic damages to Doe's mother.

30

As to the noneconomic restitution damages, the court noted that Doe was 11 years old at the time of the assault, and that, "based on its review of the facts and its own experience, . . . [Doe] has suffered over a year and a half [of] psychological trauma, physical harm, anxiety and emotional distress since the date of the incident and court concludes [Doe] will likely continue to be traumatized by [Allen's] acts against [him] in some form or another for the remainder of his life. However, court concludes this suffering will certainly cause serious traumatic effects for at least 10 years from date of incident for [Doe]."

The court made the following findings:

"The evidence presented at the restitution hearings establishes that [Allen] not only molested [Doe], but also befriended, took advantage of a position of trust, and isolated [Doe] from others in order to molest him.

"[Doe] suffered and still suffers from frequent nightmares, that was and is uncharacteristic for him and these frequent nightmares only came about after the alleged incident of molestation. The nightmares consist[ ] of the mother hearing whimpering at night or where [Doe] wakes her up because of a bad dream. [Doe] also wakes up after nightmares crying and upset. The intensity of these nightmares increased around any dates in which [Doe] knew that the criminal case involving [Allen] was going to be in court. Nightmares after the incident occurred at a frequency of about two times per week, continue to this date, and will likely continue after. [Doe] experienced nightmares in the previous 10 years of his life of no more than 4 to 5 as noted by the mother, which shows a dramatic increase post molestation.

"[Doe] suffered from panic attacks and will continue to suffer from panic attacks based on the act of molestation committed by [Allen]. Up until November 2020, [Doe] was suffering panic attacks approximately four times per week which started with chest pains and hyperventilation[;]

31

these lasted anywhere from 3 to 20 minutes per attack. After November 2020, these panic attacks reduced to approximately 1 to 2 times per week due to more successful counseling. It is reasonable to conclude[,] however, that these panic attacks will continue for a substantial period of time up to and including in some form or another the remainder of his life and at least through the minor[']s 21st birthday.

"[Doe] has also had to undergo counseling because of the act of molestation committed by [Allen]. Counseling began approximately six months after the date of incident or February 2020. [Doe] beg[a]n counseling first by seeing his school counselor two times a week[;] however that was unsuccessful, [and] he was moved to a private counselor who also saw him approximately two times per week but according to the mother no improvement was being noted. This prompted an additional change of counselor on or about November 2020 that the mother has indicated seems to be benefitting and is more successful for the minor. However, counseling sessions are expected to continue for the foreseeable future as noted by [Doe's mother] and by the letter received from [Doe]'s counselor, dated April 8, 2021[;] court will note that such counseling on a conservative estimate would be expected to continue up through and including his 21st birthday.

"[Doe] has developed after the incident of molestation trust issues with male individuals. This includes his father and brothers. He has indicated he is fearful and afraid around anyone but his mother."

The court noted "the difficult and unenviable position of quantifying [Doe]'s psychological harm in the loss of his normal childhood in dollars." It then calculated "restitution for psychological harm for non-economic damages due to the criminal conduct of [Allen] from the date of incident up to [Doe]'s twenty first birthday (8/3/2019 to 8/9/2029; 3660 days) at $30.00 per day totaling $109,800."

As for the economic damages owed to Doe's mother, the court concluded:

> "[Doe's mother] has incurred substantial economic damages as a result of the actions of [Allen] in having to seek out and pay for her son's needs stemming from the actions of [Allen] in this case.

> "[She] has missed a total of 99 hours from work at a rate of $16.26 per hour for a total of $1609.74 in lost wages. Costs incurred for physically attending hearings . . . for mileage totals $91.50. A claim was made for tutoring expenses; however, court was unable to find by a preponderance of evidence that such expenses were caused by the act of molestation and as such are not awarded herein.

> "[Doe] has been attending counseling because of [Allen]'s actions and will continue. Court finds that such counseling is expected to last at least until the minor is 21 years of age, such sessions have cost and will cost [the mother] $150 per session. As noted from the letter dated 4/8/2021 from the therapist, [Doe] is attending counseling currently as of date of letter 1 session every 4 weeks, which is approximately 1 session a month. One (1) session a month April 2021 up to [Doe]'s 21st birthday totals $10,200.00. [Doe] attended 2 sessions of counseling per month starting 6 months after date of molestation (February 2020) through end of March 2021 which total 14 months. Two (2) sessions per week, with 4 weeks on average in a month, comes to 56 sessions at $150 per session totals $8,400.00 in counseling costs through March 2021."

### C. Standard of Review and Applicable Law

The California Constitution gives trial courts broad power to impose restitution on offenders. (Cal. Const., art. I, § 28, subd. (b)(13).) "[A]ll persons who suffer losses" due to crime have the right to restitution. (*Ibid.*) Accordingly, courts have held restitution statutes should be interpreted broadly and liberally. (*In re S.E.* (2020) 46 Cal.App.5th 795, 808; *In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132; accord, *People v. Mearns*

33

(2002) 97 Cal.App.4th 493, 500 ["A victim's restitution right is to be broadly and liberally construed"]; *People v. Lyon* (1996) 49 Cal.App.4th 1521, 1525 ["statutory provisions implementing the constitutional directive have been broadly and liberally construed"].)  "[A]ny interpretation that limits a victim's right to restitution would be contrary to the expressed intent and purpose of article I, section 28 of the California Constitution." (*In re S.E.*, at p. 808.)

Generally, victim restitution is limited to "economic loss," but there is an exception for restitution orders "relating to felony convictions for lewd or lascivious acts." (See *People v. Giordano* (2007) 42 Cal.4th 644, 656 (*Giordano*); § 1202.4, subds. (a), (f).)  For such convictions, the restitution order may provide for noneconomic damages, including, but not limited to, psychological harm.  (§ 1202.4, subd. (f)(3)(F); *Giordano*, at p. 656.)

Specifically, with exceptions not applicable here, section 1202.4, subdivision (f) provides in part:

> "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . .  [¶] . . . [¶]  (3) To the extent possible, the restitution order shall be . . . of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following:  [¶] . . . [¶]  (F) Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7."

Section 1202.4, subdivision (k) states, in part, the term "victim" for purposes of the section includes the following:  "[t]he immediate surviving family of the actual victim" and, a person who has sustained economic loss as the result of a crime and, "at the time of the crime was the parent,

34

grandparent, sibling, spouse, child, or grandchild of the victim." (§ 1202.4, subds. (k)(1), (3)(A).) The statute makes no distinction between a " 'derivative victim' " and an " 'actual victim.' " (*Giordano*, *supra*, 42 Cal.4th at p. 656.)

We review the amount ordered for restitution using the abuse of discretion standard. (*Giordano*, *supra*, 42 Cal.4th at p. 663.) We ask whether the ruling " ' "falls outside the bounds of reason" under the applicable law and the relevant facts.' " (*Ibid*.) Discussing restitution for economic loss, the court in *Giordano* noted, "[u]nder this standard, while a trial court has broad discretion to choose a method for calculating the amount of restitution, it must employ a method that is rationally designed to determine the surviving victim's economic loss. To facilitate appellate review of the trial court's restitution order, the trial court must take care to make a record of the restitution hearing, analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered." (*Id.* at pp. 663-664.)

Noneconomic damages are " 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' [Citation.]" (*People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*).) "Unlike restitution for economic loss, . . . loss for noneconomic [harm] is subjectively quantified." (*Id.* at p. 436.) In light of the difference between the two types of loss, the court in *Smith* held a different standard of review must be applied to orders of noneconomic restitution to allow for the subjective considerations of the trial court judge. (*Ibid*.) The court concluded, "[w]e are guided in this matter by the civil jury instruction concerning noneconomic loss: 'No fixed standard exists for

deciding the amount of these damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense.' [Citation.]" (*Ibid.*)  " 'As a result, all presumptions are in favor of the decision of the trial court.' " (*Ibid.*)  "We therefore affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Ibid.*)

### D.  Analysis

Here, Allen argues the $20,301.24 in economic restitution awarded Doe's mother as well as the $109,800 in noneconomic restitution awarded to Doe under section 1202.4, subdivision (f)(3)(F) were not supported by substantial evidence.  We disagree.

Allen's primary argument is that the court relied on evidence provided by Doe's mother, "which was inconsistent and biased—not the most reliable source of information."  Yet, the fact that the superior court relied on the testimony of Doe's mother does not undermine the validity of the restitution award.  While restitution orders must be supported by substantial evidence, there is no requirement that the evidence provided be from a particular source.  "Section 1202.4 does not, by its terms, require any particular kind of proof.  However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542-1543 (*Gemelli*), citing *People v. Foster* (1993) 14 Cal.App.4th 939, 946 (*Foster*).)  The trial court applies a standard of proof of preponderance of the evidence, not proof beyond a reasonable doubt.  (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045.)

The victim must make a prima facie showing of the loss, which the defendant is entitled to rebut.  "Once the victim makes a prima facie showing

of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim. [Citation.] The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the repair or replacement cost of damaged or stolen property." (*Gemelli*, *supra*, 161 Cal.App.4th at p. 1543; see *Foster*, *supra*, 14 Cal.App.4th at p. 947.)

Looking first to the award of economic damages, the March 18, 2021, memorandum filed by the probation detailed the basis for Doe's mother's economic damages. To this end, she claimed $1,609.74 in lost wages (99 missed hours of work multiplied by a pay rate of $16.26 per hour), $91.50 in mileage expenses (for attending two court hearings calculated at 163.4 multiplied by .56 per mile); $95,160 in tutoring expenses for Doe for the next five years; $4,092 in medical expenses for Doe; $171,600 in counseling expenses; and $25,168 in mileage expenses for the counseling sessions. The counseling expenses were calculated as follows: the psychologist recommended amount of two sessions per week ($150 per session, for a total of $300 per week) until Doe turned 21 years old (11 years, or 572 weeks). The counseling mileage expenses were calculated as follows: $22 in mileage per session, for a total of $44 per week, for a total of 11 years (572 weeks).

Yet, the court did not accept this evidence without question. Indeed, the court requested additional information regarding Doe's counselor's experience, the average length of recovery, and the length of counseling required. In response to the court's request, the probation officer filed a supplemental report on April 20, 2021. This report included a letter from Doe's counselor indicating the purpose of Doe's therapy, stating he was changing Doe's therapy to once every four weeks, and explaining that the

frequency and length of treatment is reevaluated very six to 12 months or sooner depending on need. The supplemental report indicated that Doe's mother "was very disappointed with the letter from the counselor" and emphasized the Doe did not want to reduce his counseling sessions to once every month. Additionally, Doe's mother indicated that she would search for online counseling for Doe as well.

Ultimately, the court did not award Doe's mother the amount of economic restitution she requested. Rather, the court awarded Doe's mother $1,609.74 in lost wages and $91.50 for mileage to attend the court hearings. For the cost of counseling, the court found that Doe would need counseling until he was at least 21 years old and then, based on the counselor's letter, concluded that Doe would go to counseling once a month. So, it calculated one session at $150 per month from April 2021 until Doe's 21st birthday, which totaled $10,200. The court also noted that Doe attended two counseling sessions per week from February 2020 through the end of March 2021 for a total of 56 sessions. Accordingly, the court awarded Doe's mother an additional $8,400 in previous counseling costs. In all, the court awarded Doe's mother $20,301.24 in economic restitution. In doing so, the court rejected the mother's testimony that such restitution should include $4,092 in medical expenses, $25,168 in mileage expenses to take Doe to counseling sessions, $95,160 in tutoring expenses for Doe, and an additional $153,000 for counseling.

Here, Allen repeats the same arguments he made during the restitution hearing below. He argues that the only evidence in front of the court was Doe's mother's testimony, and such evidence cannot constitute substantial evidence. To this end, he relies on *In re Travis J.* (2013) 222 Cal.App.4th 187 (*Travis J.*). That case, however, is distinguishable from the

instant matter. There, the appellate court conclude a restitution award was not supported by substantial evidence when there was no evidence presented to the court that the victim paid $800 to replace a single tire on her car or lost $50 in wages. (*Id.* at p. 204.) Further, the appellate court observed that the juvenile court specifically indicated that it did not find the victim's statements to the probation officer credible. The appellate court thus determined the restitution award was based "on nothing more than speculation." (*Ibid.*)

Here, the superior court's restitution award to Doe's mother is not plagued by the same problems that existed in *Travis J.* There is no indication that the court found Doe's mother unbelievable. Also, there was other evidence, besides the mother's testimony, presented to the court, including a letter from the counselor treating Doe as well as the opinion of a clinical social worker that Doe would receive two counseling sessions per week until he turned 21 years old with a cost of $120 per session. The court accepted some of the evidence offered to support restitution and rejected other evidence. In other words, the court carefully weighed the evidence and did not simply accept everything the mother provided without question. Nevertheless, Allen argues the court should not have found Doe's mother reliable and points out other evidence (e.g., Doe had attended some counseling before the subject incident) and argues that evidence undercuts the court's restitution award. In this sense, Allen is asking us to reweigh the evidence. This we will not do. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [" 'we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder' "]; *People v. Balestra* (1999) 76 Cal.App.4th 57, 63.)

Against this backdrop, we find the economic restitution awarded to Doe's mother supported by substantial evidence. Allen's arguments here go to the weight of the evidence, not the lack of substantial evidence to support the award.

Turning next to Allen's challenge of the noneconomic restitution awarded to Doe, we similarly conclude his contention is without merit. Allen again finds fault with the trial court relying on the testimony of Doe's mother. For the reasons we discussed *ante*, we reject this argument.

Further, *People v. Valenti* (2016) 243 Cal.App.4th 1140 (*Valenti*), cited by Allen, does not persuade us that the court's award of noneconomic restitution cannot stand. In *Valenti*, the appellate court reversed awards of $50,000 in noneconomic damages to three victims. (*Id.* at p. 1182.) The court noted the record contained "no victim declarations independent documentation, or professional evaluations" in support of the court's award of $50,000 of noneconomic damages. (*Ibid.*) There, the People's sentencing memorandum cited to *Smith* and listed the requested sums but the People "did not submit any support for the figures." (*Ibid.*) The only information about the victims was "filtered through their parents and conveyed in the probation report or in a statement at sentencing" and did not support the court's award. (*Ibid.*) The mother of one victim reported to probation the victim " 'did not sustain actual child abuse' " and "had not expressed his true feelings or discussed them with his mother." (*Ibid.*) The mother of a second victim reported the victim was " 'doing fine' " and the mother had " 'not noticed any emotional scars.' " (*Ibid.*) At the sentencing hearing, the third victim's mother reported the victim was " 'excellent.' " (*Id.* at p. 1183.) Based on the record in that case, the appellate court concluded "the court's only apparent basis for awarding $50,000 [to each of the three victims] was the

Third District's opinion, *Smith*." (*Ibid*.) The appellate court concluded the trial court "did not find facts, cite reliable evidence, or even explain how it arrived at the amount of restitution awarded to each victim. There was no evidence, either through direct testimony or victim-impact statements, that the children suffered nightmares or flashbacks, that they were having trouble in school or problems making friends, that they had considered harming themselves or others, or that they had sought or received counseling in any form." (*Ibid*.) Rather, the "three families were relieved that their sons had not 'actually' been abused." (*Ibid*.) The court concluded that, "[b]ecause the court did not 'demonstrate a rational basis for its award' or 'ensure that the record is sufficient to permit meaningful review,' " the award of noneconomic damages to those three victims had to be reversed and the matter remanded for directions for the trial court to hold a restitution hearing. (*Id*. at pp. 1183-1184, citing *Giordano*, *supra*, 42 Cal.4th at p. 664.)

Here, in contrast to *Valenti*, there was substantial evidence that Doe had been sexually assaulted by Allen and that Doe suffered emotional damage as a result. Additionally, unlike the victims in *Valenti*, Doe was in counseling for the trauma experienced, and there was ample evidence that he was suffering from panic attacks, nightmares, fear, anger management and trust issues, and has difficulty making friends, all as a result of Allen's offense. While Doe's mother presented evidence that he had received counseling in the past for some behavioral issues, she made it clear that the current counseling sessions were "100 percent" attributed to Allen's offense, and it was reasonable for the trial court to conclude that Doe's current behavior and need for counseling was not because of some preexisting problem. Moreover, contrary to the trial court in *Valenti*, the court here explained the factors considered in making its determination, and it

41

independently considered the facts of the case when coming to the amount of $109,800 in noneconomic damages. As such, there is no basis on the record before us to conclude that this award shocks the conscience. (See *Smith, supra,* 198 Cal.App.4th at p. 436; *People v. Lehman* (2016) 247 Cal.App.4th 795, 803.)

## III

## FINES AND FEES

At the sentencing hearing, the superior court ordered Allen to pay various fines and fees, including a probation supervision fee of $25 per month, an administrative fee of $200 for the preparation of the probation report, and an administrative collection processing fee of $25. The imposition of these fees was based on certain local county ordinances that relied on section 1203.1b, subdivisions (a)(1) and (h) as those subdivisions existed at that time.

Allen argues these fees are no longer collectable and must be stricken from the probation order under Assembly Bill No. 1869 (2019-2020 Reg. Sess.), which became operative on July 1, 2021. With passage of this bill, among other things, the Legislature repealed the statute (§ 1203.1b) authorizing the challenged fees. Section 1203.1b was not replaced.

The Legislature also enacted laws that rendered uncollectible imposed but unpaid probation and booking fees as of July 1, 2021, and require the court to vacate those fee orders as to any unpaid balances remaining on July 1, 2021 (Pen. Code, § 1465.9, subd. (a); Gov. Code, § 6111). Under Penal Code section 1465.9 and Government Code section 6111, any unpaid fees are unenforceable and uncollectible on or after July 1, 2021. Therefore, judgments imposing such fees must be vacated as to those uncollectable fees. (Pen. Code, § 1465.9, subd. (a); Gov. Code, § 6111.)

42

The People do not disagree that the law has changed, but they note that the fees were collectible until June 20, 2021.  Therefore, instead of striking the fees in their entirety, they ask us to vacate any portion of the fees remaining unpaid after July 1, 2021.  We agree that the unpaid fees must be vacated.  (See *People v. Clark* (2021) 67 Cal.App.5th 248, 260; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 952.)

Per the recent fees legislation, Assembly Bill No. 1869, and Penal Code section 1465.9 and Government Code section 6111, the probation supervision fee, the preparation of the probation report fee, and an administrative collection processing fee must be vacated to the extent they require payment of uncollected fees remaining on or after July 1, 2021.

DISPOSTION

The postjudgment restitution order is affirmed.  We strike the probation conditions:  (1) relating to Allen's possession of sexually explicit material, (2) limiting Allen's presence at establishments selling or containing sexually explicit material, (3) prohibiting Allen from congregating with minors, (4) imposing a curfew on Halloween, and (5) requiring Allen to report contacts with law enforcement.  We remand this matter back to the superior court to consider the need for revised probation conditions to address those that we have stricken and ensure that the probation term complies with Assembly Bill No. 1950 (Stats. 2020, ch. 328, § 2).  Also, on remand, we instruct the superior court to vacate the probation supervision fee, the preparation of the probation report fee, and the administrative collection processing fee to the extent that they remain unpaid after July 1, 2021.  After

43

conducting further proceedings, the superior court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


                                                            HUFFMAN, J.

WE CONCUR:



McCONNELL, P. J.



IRION, J.